The bill is to quiet title to certain lands in Monmouth county. Of the sixteen defendants, only six answered, and a default decree was entered against the ten non-answering defendants on May 11th, 1936, on the advice of an advisory master. The answering defendants Helen B. Small, James G. Beattie, Jr., and Margaret B. Palmer each claim an undivided remainder interest in the premises described in the bill of complaint by virtue of the will of their grandfather, Robert J. Dalton. The answering defendants Fred G. Small and Prescott W. Palmer each claim an inchoate right of curtesy in the shares of their respective wives and the answering defendant May I. Beattie claims an inchoate right of dower in the share of her husband. The issues as framed by the pleadings involve the construction of the will of Robert J. Dalton, deceased, and also the construction of section 1 of "An act for the limitation of suits respecting title to land." Revision of 1877, page 598, now section 28, 3 Comp. Stat. p.3172, as amended by chapter 188, P.L. 1922 p. 315. For a clear understanding of the issues the following statement of facts touching the title claimed by the respective parties is necessary.
Robert J. Dalton, of Jersey City, died on January 10th, 1889, seized of considerable real estate in Hudson county, and of certain property abutting on the Shrewsbury river in Monmouth county known as the "Goose Neck property." He left him surviving three sons, Frank, William and Leon, and two daughters, Rosamond Reynolds and Mary Ella Beattie. By his will, which was probated June 21st, 1889, he made provision for all of his children, his two daughters being *Page 393 
provided for by the fifth and sixth (unnumbered) paragraphs of said will. The sixth paragraph, the only portion of the will requiring construction, is as follows:
"I also give, devise and bequeath jointly, share and alike, to my daughters, Rosamond and Mary Ella, my farm or messuage situated at Goose Neck, Monmouth County and State of New Jersey, together with all furniture, plate, horses, waggons and everything belonging to me, situated thereon, and to their lawful issue providing however should either die before or without legal issue, then the whole of the real estate before mentioned or the share of the one dying. I give, bequeath and devise to my sons, Leon and Wm. Dalton and to their issue share and share alike as to and meaning the property situated in Jersey City, Hudson County, the property in Monmouth County at Goose Neck in case of death of either daughter with or without legal issue (the aforesaid share mentioned) to my son Leon Dalton I give, devise and bequeath in case of death of both daughters he the said Leon Dalton to take the whole of the property aforementioned, situated at Goose Neck, Monmouth County and State of New Jersey."
Complainant's title subsequent to the death of Robert J. Dalton, chronologically, is as follows:
June 1st, 1900, Rosamond and Mary Ella, daughters of Robert J. Dalton, conveyed the premises in question to Leon Dalton in fee.
March 10th, 1904, Leon Dalton conveyed to Charles W. Ostrum.
March 10th, 1904, Charles W. Ostrum conveyed to Mary J. Dalton, wife of Leon Dalton.
August 3d 1919, Mary J. Dalton conveyed to Mary B. Shera.
March 4th, 1934, Mary B. Shera conveyed to complainant.
The bill of complaint was filed February 6th, 1936, Leon Dalton and his successors in title having been in actual possession of the premises in question since June 1st, 1900.
Rosamond Reynolds and Mary Ella Beattie are still alive. Rosamond had issue one son, Edmond B. Reynolds, one of the non-answering defendants, who is still alive.
Mary Ella had issue six children, as follows: Helen B. Small, born 1893, James G. Beattie, born 1895, and Margaret B. Palmer, born 1897, answering defendants, and *Page 394 
Lawrence Beattie, Gordon Beattie and Frank D. Beattie, non-answering defendants, all of whom are still alive.
Complainant contends that under the will testator's daughters took a life estate in the Goose Neck property with remainder in fee to Leon Dalton and that upon the purchase of their interests by Leon in 1900 an estate in fee-simple vested in him. On the other hand, the answering defendants (issue of Mary Ella) claim that the daughters took a life estate with remainder to their issue. Complainant counters with the contention that irrespective of what title was vested in Rosamond and Mary Ella, his title is now complete because he and his predecessors in title back to Leon Dalton have been in actual possession of the premises for a period of over thirty years, and that by virtue of chapter 188,P.L. 1922 p. 315, his title is complete; and that, therefore, he is entitled to a decree in this cause. The answering defendants rejoin with the assertion that the possession of Leon Dalton and his successors in title, including that of complainant, was not adverse to them because the statute does not run against a remainderman until his right to possession accrues, that is, until the death of the life tenants, and that the life tenants are still living. But, says the complainant, the possession required under the statute is not adverse possession, but actual possession only, irrespective of its character or how it was acquired. These various contentions necessitate, first, the determination of the estate vested in Rosamond and Mary Ella under the will; second, the character of the possession required under the statute for the vesting of title in one other than the true owner; and third, whether complainant's possession is effective to vest a complete title in him as against the answering defendants.
 I.
In construing the Dalton will, it should be borne in mind that, as is evident from its composition, it was prepared by one unskilled in legal phraseology, unlearned in the law and ignorant of the rules of punctuation as well as those of English *Page 395 
grammar. It probably was prepared by the testator himself; certainly not by a lawyer. A careful reading of the sixth paragraph above quoted shows that it is readily divisible into four parts, as follows:
1. "I also give, devise and bequeath jointly, share and share alike, to my daughters, Rosamond and Mary Ella my farm or messuage situated at Goose Neck, Monmouth County and State of New Jersey, together with all furniture, plate, horses, waggons and everything belonging to me, situated thereon, and to their lawful issue"
2. "providing however should either die before or without legal issue, then the whole of the real estate before mentioned or the share of the one dying, I give, bequeath and devise to my sons, Leon and Wm. Dalton and to their issue share and share alike as to and meaning the property situated in Jersey City, Hudson County"
3. "the property in Monmouth County at Goose Neck in case of death of either daughter with or without legal issue (the aforesaid share mentioned) to my son Leon Dalton I give, devise and bequeath"
4. "in case of death of both daughters he the said Leon Dalton to take the whole of the property aforementioned, situated at Goose Neck, Monmouth County and State of New Jersey."
It is conceded by counsel for both complainant and the answering defendants that at common law the language of part 1 above quoted would vest a fee-tail in Rosamond and Mary Ella and that by the statute of descents (2 Cum. Supp. Comp. Stat. p.1921 § 11) such estate is changed to a life estate in the daughters with a vested remainder in fee to their children. Complainant contends, however, that the subsequent language of that paragraph vests a remainder in fee in Leon Dalton.
The entire remainder of the sixth paragraph of the will may be exscinded and disregarded, as a careful reading will demonstrate that it has no bearing on the present controversy. Part 2 relates only to the Jersey City property described in the preceding (fifth unnumbered) paragraph of the will. Part 3 gives to Leon Dalton a life estate in case of the death of either daughter with or without issue, an event which has not yet occurred. He could acquire only a life estate under this provision because of the words "the aforesaid share mentioned" which refers to the share given to the daughters and which, as shown above, could not exceed a life estate. *Page 396 
And Part 4 clearly has no application because the words "in case of death of" as therein used, refer to the death of the daughters before the death of the testator, an event which did not occur. This is settled law. Barrell v. Barrell, 38 N.J. Eq. 60;Fischer v. Fischer, 75 N.J. Eq. 74.
The construction of the portion of the will dealing with the Goose Neck property most favorable to Leon Dalton names two contingencies as prerequisites to the vesting of any estate in him; first, that the daughters, or one of them, should predecease the testator; second, that they, or one of them, should die after the testator without legal issue. Neither of these contingencies happened. Rosamond and Mary Ella having only a life estate in the Goose Neck property with a vested remainder in fee to their children, their deed to Leon in June, 1900, conveyed only what they had, notwithstanding it purports to convey a fee. 2 Tiff.Real Prop. 2013, 513(g). As the ancient maxim has it: "He gives nothing who has nothing" or "no one gives who possesses not." Where a life tenant conveys and warrants a fee, his warranty is void. Conveyancing act, 2 Comp. Stat. p. 1535 § 2;Den v. Robinson, 5 N.J. Law [*]689-707.
 II.
The next question to be determined is whether complainant's actual possession of the premises in question for a period of thirty years has ripened into a perfect title under the statute. This inquiry is divisible into (a) the character of the possession required by chapter 188, P.L. 1922; and (b) whether or not the possession of complainant is operative as against the answering defendants. The proofs are conclusive that the complainant and his predecessors in title back to Leon Dalton have had actual possession of these premises since June 1st, 1900.
 (a)
As to the character of the possession required under the statute, complainant contends that actual possession for *Page 397 
thirty years only is required and that such possession need not be adverse, citing in support of this contention Model PlanAgency v. Diamond, 100 N.J. Eq. 244; Eckhause v. BerwynEstates, 104 N.J. Eq. 416; Pinckney v. Burrage, 31 N.J. Law 21;Spottiswoode v. Morris and Essex Railroad Co., 61 N.J. Law 322;Conaway v. Daly, 106 N.J. Law 207; Gordon v. LumbervilleDelaware Bridge Co., 108 N.J. Law 261; Croxall v. Shererd,72 U.S. 268; Carr v. Banghart, 112 N.J. Law 324; Wright v.Scott, 4 Wn. Cir. Ct. Rep. (U.S.) 16, 24.
The statute to be construed reads as follows:
"Thirty years' actual possession of any lands, tenements, or other real estate, excepting woodlands or uncultivated tracts and that sixty years' actual possession of any woodlands or uncultivated tracts, uninterruptedly continued by occupancy, descent, conveyance or otherwise, in whatever way or manner such possession might have commenced, or have been continued, shall vest a full and complete right and title in every actual possessor or occupier of such lands, tenements, or other real estate, and shall be a good and sufficient bar to all claims that may be made, or actions commenced by any person or persons whatsoever, for the recovery of any such lands, tenements or other real estate."
No claim of title under any other act is made.
The requirement of adverse possession by the language of this act would perhaps never have been questioned except for certaindicta in the opinion of the supreme court in Pinckney v.Burrage, 31 N.J. Law 21. That court (at p. 24), said:
"What effect a possession of sixty years may have by virtue of the first section of the act, it is not necessary now toinquire."
But notwithstanding this statement that the first section of the act of 1787 (now chapter 188, P.L. 1922) was not involved in that controversy, the defendants there relying only upon the second section of that act, Mr. Justice Elmer, speaking for the court, proceeds:
"The broad and comprehensive language of it may possibly justify its application even to the cases of reversioners and remaindermen;" and after referring to a statement by Blackstone (3 Bl. Com. 196) "that the possession of lands *Page 398 
in fee-simple uninterruptedly for three score years, is at present a sufficient title against all the world, and cannot be impeached by any dormant claim whatsoever," and its criticism by other writers, he proceeds:
"Still it may be that this statute was framed with the intent to produce the effect Blackstone, at that time the great authority in New Jersey, had stated the English statutes had."
He then proceeds to dispose of the issues upon the construction of the second section of the act, which is the section under which the defendants claimed. This unfortunate and unnecessary language has since been repeatedly quoted and referred to by other judges, but without, so far as I am aware, its meaning having either been judicially determined or applied. No one seems to have given effect to the suggestion that the language of the act might justify its application to reversioners and remaindermen. The most that can be said for the suggestion is that it was argumentative dictum.
The latest judicial reference to the language is by Mr. Justice Bodine, speaking for the court of errors and appeals, in Carr
v. Banghart, supra. He says:
"There is even a suggestion in Pinckney v. Burrage * * * that `the broad and comprehensive language of the statute may possibly justify its application to the case of reversioners and remaindermen.' But we think not as against the interest of the state." (Italics mine.)
The word "even" in this reference indicates a thought that the statement of Mr. Justice Elmer was too far reaching.
In Spottiswoode v. Morris and Essex Railroad Co., supra, Mr. Justice Depue, speaking for the supreme court (at p. 328), said:
"Possession obtained and held as prescribed by the first section of this act will confer a title paramount to the claims or rights of all other persons. Such a possession will bar the issue in tail, as well as the tenant in tail, against whom it commenced its operation," citing Wright v. Scott, supra. He was there referring to section 1 of the act of 1787, the modern version of which is the subject of our discussion. *Page 399 
It is contended that this statement justifies the inference that the statute would begin to run against the remainderman before the life estate is ended; but the court also held that neither the first nor the second section of the act of 1787 had any application to the issue there involved, but that it was section 9 of the act of 1799 which controlled. The discussion, therefore, would appear to have been unnecessary and the remarks purelydictum. However, rightly understood, the language, in my judgment, does not justify the suggested inference. For a discussion of "estates tail" see 1 Washb. Real Prop. 72 ¶ 22.
The words "tenant in tail" refer to the one presently entitled to the possession of the estate. The words "issue in tail" refer to an heir prospectively entitled to a life estate. Neither term has any reference to a reversioner or remainderman. That the quoted language had no such meaning as is here contended is plain when it is considered that before estates tail were abolished it was recognized that "while possession adverse to a tenant in tail told against the issue in tail, who claimed in right of the same estate, such possession, though protracted for centuries, went for nothing as against the remainderman or reversioner, who had a substantive right, which did not accrue until failure of issue in tail." 2 Tiff. Real Prop. 1950 ¶ 506, quoting from 1 Hayeson Conveyancing (5th ed.) 258. And see Den v. Morris,7 N.J. Law 6. When, therefore, in the Spottiswoode Case the court said "such possession will bar the issue in tail as well as the tenant in tail," it was not referring to the remainderman or reversioner in whom the fee was vested subject to the precedent estates, and the decision does not support complainant's contention. The same comment applies to Judge Swayne's statement in Croxall v. Sherrerd, supra, that "the statute contains no qualifications or exceptions as to issue in tail and we can interpolate none."
The complainant also contends that in Model Plan Agency v.Diamond and in Eckhause v. Berwyn Estates, I held that the thirty years' possession required under chapter 188, P.L. 1922, to vest complete title need not be adverse, but *Page 400 
that is not so. What was held in Model Plan v. Diamond is that the title there involved came directly within the provisions of section 2 of the 1787 act and that it might very well have been based upon a grant to the person in possession and supposed to have a legal right and title and such grant may have been lost, and that defendant's title there involved did not rest in adverse possession within the meaning of these words as used inthe contract of sale. The decision in the Eckhause Case was to the same effect. The only statement about adverse possession was that the possession was not the adverse possession contemplatedby the contract. In both cases the contract, not the statute, as to adverse possession, was construed.
Conaway v. Daly, supra, does not hold that the possession required under the statute need not be adverse. On the contrary, the concluding paragraphs of Mr. Justice Bodine's opinion clearly show that what the court was there considering was adverse possession. He said:
"When Roth entered under his agreement of purchase, his possession straightway became adverse as against everyone save his grantor. When the purchase money was paid and the deed received the continuity of his possession was not interrupted."
This was, of course, but an application of the familiar rule that "an owner of the fee against whom the statute has commenced to run cannot interrupt its running by creating a particular estate." 2 Tiff. 1952 ¶ 506. It is true that Mr. Justice Bodine quotes the recited dictum of Mr. Justice Elmer in Pinckney v.Burrage; but, at best, what Mr. Justice Elmer said amounted to nothing more than a query. 1 N.J. Digest tit. "AdversePossession" 109, 1A, 3. And this reference, as well as the original dictum, was merely arguendo.
In Gordon v. Lumberville Delaware Bridge Co., supra (at p.264), Mr. Justice Trenchard, speaking for the court of errors and appeals, said that: "where * * * the defendant has pleaded actual possession uninterruptedly continued by occupancy for sixty years, and the plaintiffs admitted that to *Page 401 
be so, the burden rests upon the plaintiffs who claim that the statute does not apply to prove the existence of facts which support their claim."
The inference is inescapable that there may be facts in a given case which will show the statute to have been inoperative. But complainants claim that if actual possession has continued for thirty years, there can exist no facts sufficient to prevent the vesting of a perfect title. The fallacy of this argument is shown when it is considered that under that doctrine, the actual possession of a life tenant for thirty years would always bar the remainderman. It would be necessary only for a devisee for life to survive for a period of thirty years and retain the possession to which he was entitled in order that his life estate might ripen into a fee, and thus the bounty of the testator bestowed upon the remainderman would be defeated and the testator's intention frustrated. Such an intent should not be read into the statute. The effect of Mr. Justice Trenchard's language is, apparently, that where actual possession has been shown for the statutory period the burden of showing that such possession was not adverse is upon the party claiming the statute inoperative. This burden may be borne by a showing that because of some disability recognized by law the statute did not begin to run as claimed. For example, as here, that the life tenant is still alive and that defendant's right of entry has not as yet accrued and that therefore, the statute could not be operative against the remaindermen. There is no case decided by the courts of this state, so far as I have been able to find, that holds that actual possession for thirty years under chapter 188, P.L. 1922, during the lifetime of the life tenant will cut off the remainderman, nor that the operation of the statute is not suspended during the disability of an infant or other claimant. In Conaway v. Daly it appears from the facts stated in the opinion that the plaintiff in that suit did not attain her majority until June 4th, 1910, less than twenty years prior to the institution of her ejectment action. Her right, if any, accrued upon the death of her grandmother in 1897. The deed under which the defendants in ejectment *Page 402 
claimed was that of the supposed heirs of Mrs. Schafer and was dated December 28th, 1898, more than a year after her death. Obviously possession under that deed could not be adverse as against the plaintiff until she became of age. But the court found that defendant's possession related back to the entry of Roth under his contract of purchase from plaintiff's grandmother in 1896 or 1897; that such possession was adverse as against everyone except his grantor, including the plaintiff; and that the subsequent acceptance of a deed in performance of the contract did not interrupt the continuity of adverse possession. Aside from this, an inspection of the state of the case and briefs on appeal discloses that the infancy of the plaintiff was neither interposed as a bar to the operation of the statute nor argued before the court.
On the other hand, a consideration of the authorities in this and other jurisdictions clearly indicates that the possession requisite to a perfect title under this act must be adverse. InHummer v. Buerk, 90 N.J. Eq. 97, Vice-Chancellor Backes wrote on the assumption that such was the requirement. He said (at p.101):
"Now, it is obvious that the provision of section 28 operating upon the unbroken, adverse possession for more than sixty years, sets at complete rest the complainant's title."
The syllabus is "sixty years' unbroken adverse possession sets at complete rest a title to land." A passing assumption by this distinguished jurist is the equivalent of an express declaration of the facts assumed. That case was decided in 1919 prior to the 1922 amendment of section 1 of the 1787 statute while the requirement was sixty years' instead of thirty years' possession. In Smith v. Kane, 49 N.J.L.J. 304, Mr. Justices Donges said:
"The actual possession referred to in section 28 of the statute of limitations (Comp. Stat. p. 3172) and the twenty year limitation in section 16 of the same act, to defeat ejectment, must both be hostile and adverse."
And in Osterweil v. Newark (Court of Errors and Appeals,1935), 116 N.J. Law 227, there is a clear indication that the possession required under the act must be an adverse possession. *Page 403 
The statute was there invoked by the plaintiff in ejectment against the city of Newark and Judge Rafferty, speaking for the court of errors and appeals (at p. 233), said:
"This contention implies that appellant's title as against the dedication has been secured by possession adverse and hostile to the public right to accept the dedication."
He then held the possession was not adverse and that the doctrine that "adverse possession does not run against the state" is firmly imbedded in our law. In discussing this statute it is assumed that our court of last resort would not have used the term "adverse possession" if that is not the character of the possession contemplated by the act. In Kirk v. Smith, 9 Wheat.241 (at p. 288), Chief-Justice Marshall said:
"One of the rules which apply to acts of limitation generally which has been recognized in the courts of England and in all others where the rules established in those courts have been adopted, is that possession, to give title, must be adverse. The word is not, indeed, to be found in the statutes, but the plainest dictates of common justice require that it should be implied. It would shock the sense of right which must be felt equally by legislatures and judges, if a possession which was permissive and entirely consistent with the title of another should silently bar that title."
In Colton v. Depew, 60 N.J. Eq. 454, it was held that "in order that possession shall give title, it must be adverse to the real owner. Mere possession for twenty years will not constitute a bar." (Italics mine.) While in that case section 16 and not section 28 of the statute of limitations was under consideration, I think the language applies generally to all statutes of limitation affecting titles to land and no less to section 28 than to section 16. This is required by "the plainest dictates of common justice." It will be noted that nowhere in section 16 nor in section 17, nor, in fact, in section 29, are the words "adverse possession" used. But our courts are in complete accord in holding that the possession required by each section is an adverse possession. As a matter of fact, neither section 16 nor section 17 is *Page 404 
classified in the statutes under "adverse possession," while section 28 (now chapter 188, P.L. 1922) and section 29 are both classified under "Title to land by adverse possession." This is a plain indication that the compiler of the statutes, at least, considered that the possession required under those acts must be adverse.
Title to land acquired under similar acts of limitation is variously referred to as "title by adverse possession," "statutory title," or "title by limitation." In 2 Corpus JurisSecundum 568 ¶ 53, it is stated that "one of the requisites of a title by prescription or limitation is a possession hostile in character. Where the element of hostility is absent, possession can never ripen into title." To the same effect is Wittke v.Wittke (Court of Errors and Appeals, 1925),102 N.J. Law 176. And see Foulke v. Bond, 41 N.J. Law 527, 538.
Thirty years' possession, in order to ripen into a complete statutory title under chapter 188, P.L. 1922, must be adverse in character. If the element of hostility is lacking the statute is inoperative.
 b.
It remains to be determined whether or not the possession of the complainant and those under whom he claims has been adverse to the answering defendants or is operative under the statute to vest in him a complete title. In DeLuca v. Melin,103 N.J. Law 140 (at p. 144), Mr. Justice Campbell (now chancellor), speaking for the court of errors and appeals, said:
"To sustain a title by adverse possession the party relying thereon must establish a continued, open, visible and exclusive possession and one that is hostile, that is, with the intention to claim title against the true owner, and, obviously, it must appear that the possession, or use, which is claimed to be adverse was such that the owner knew, or should have known, that the disseizor intended to make title under it."
That is the general rule in this state applying to adverse possession. The general rule as to possession against a remainderman or reversioner is that: *Page 405 
"The statute of limitations does not begin to run against any person until a right of action has accrued to him. Hence no disseisin on the part of anyone can affect the reversioner or remainderman until the termination of the life estate. An owner cannot be barred while he has no right to possession or capacity to sue, or where for any other reason he is prevented by law from asserting his rights; hence the rule that the statute will not run against remaindermen during the existence of the precedent estate * * *. But the possession of the life tenant and of any person claiming under him does not become adverse as against the remainderman until the cessation of the life estate." 3 Thompsonon Real Property 658.
"One who enters into the possession of land under a deed which he supposes conveys a fee, but which in fact only gives him an estate for the life of another, upon the death of such other, becomes the reversioner's tenant by sufferance, and cannot set up a claim of adverse possession under the deed against the reversioner's grantee." Tyler on Ejectment, 924.
See, also, 2 Tiff. Real Prop. 2012 ¶ 513 subsec. g; p. 1950 ¶506; 1 American Jurisprudence tit. "Adverse Possession" 860 §§121, 122; 2 Corpus Juris Secundum 568, 570 ¶¶ 53 et seq.; 13 Am. Eng. Encyl. L. 720; Angell on Limitations 386 § 4; Tyler onEjectment and Adverse Possession 919, 920, 946, and cases cited;Christie v. Gage, 71 N.Y. 189, 192, 193; Pinckney v.Burrage, supra, and Den v. Morris, supra.
In the last cited case, the court (at p. 18), said:
"* * * the possession of the tenant for life, even though the estate for life should pass into twenty hands successively, is still the possession of the reversioner, so that he who enters or holds over against such reversioner after the termination of the life estate, so far from being able to justify himself under an adverse possession, is directly guilty of that species of ouster called in our books an intrusion, and may be immediately dispossessed by the mere entry of the reversioner or remainderman."
And in Hall v. Otterson, 52 N.J. Eq. 522, it was held that "time under either section (16 or 17) does not run against the remainderman until the death of the tenant for life." The requirements of sections 16 and 17 as to the character of the possession being identical with section 28 as amended, this decision is applicable here. *Page 406 
From these authorities I think it is plain that the possession of the complainant and those under whom he claims has not been adverse to the answering defendants and that the statute has not operated to vest title in him as against such defendants. Having reached this conclusion, it is unnecessary to discuss the other questions argued in the briefs of counsel. I will advise a decree in accordance herewith.